STATE of Tennessee, Appellee,

v.

Bobby R. WILCOXSON, Appellant.

Supreme Court of Tennessee,
at Knoxville.

May 1, 1989.

Rehearing Denied June 5, 1989.

Bates W. Bryan, Jr., Hiram G. Hill, Howell G. Clements, Chattanooga, for appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Kathy M. Principe, Asst. Atty. Gen., Nashville, Gary D. Gerbitz, Dist. Atty. Gen., Chattanooga, for appellee.

OPINION

O'BRIEN, Justice.

On 19 December 1985 the Grand Jury of Hamilton County returned a true bill against defendant charging him with the first degree murder of Robert D. Mosher. Defendant was tried, convicted and sentenced to death.

Although the sufficiency of the evidence is not questioned a summary of the facts surrounding the homicide is essential to resolution of the issues raised. On 23 October 1982, at approximately 11:00 p.m., the body of Robert Mosher was found at his home in Signal Mountain, Tennessee by his wife, Evelyn Mosher, who had been attending a rock concert at the University of Tennessee—Chattanooga Arena. Mr. Mosher's body was lying on the stairs leading from the garage into the house. He had been suffocated by pushing a large sheet of plastic eight to ten inches down into his throat with a hard object. There was substantial trauma to his larynx. His

lungs had collapsed. The inside of his throat was bruised down to his vocal cords and trachea. Other injuries to his body including a cut on his forehead, bruises and loosened teeth, indicated a struggle had occurred. Mr. Mosher had various insurance policies naming his wife as beneficiary. After some delay due to questions surrounding the homicide she received slightly over $200,000 in insurance proceeds.

Mr. and Mrs. Mosher were married in 1974 several years after the death of his first wife. He was approximately twenty years her senior. It was not long until the marriage began to deteriorate. Mrs. Mosher became engaged in drug trafficking and people involved in the drug culture frequented the Mosher residence. In April 1985 police officers searched the Mosher home under a warrant for drugs in a separate case. They uncovered Evelyn Mosher's personal address book containing the telephone numbers of defendant and his brother. Ultimately, incriminating evidence was developed against defendant resulting in his trial and conviction. Mrs. Mosher was also convicted of first degree murder in the death of her husband and was sentenced to life imprisonment in 1986.

In his argument, asserting he was denied the right to a speedy trial, defendant also intermingles a claimed violation of T.C.A. § 40–18–103 which provides that any charge of a Class X felony shall be tried within 150 days following arraignment.

■ Although a violation of the statute is certainly some indicia to be considered in determining whether an individual has been denied his constitutional right to a speedy trial the criteria in the statute are not to be confused with the right reserved to a criminal defendant under the constitution. The Class X felony law was enacted, not to benefit a defendant, but to identify and define specific offenses against society for which enhanced penalties and expedited proceedings were prescribed so as to assure swift and certain punishment for their violation. See *State v. Taylor*, 628 S.W.2d 42, 46–47 (Tenn.Cr.App.1981). The statute specifically provides that a failure to comply with its subsections shall not act to require release of a defendant from custody or a dismissal or withdrawal of charges.

■ Looking to defendant's constitutional claim, undoubtedly, his right to a speedy trial is secured equally by Article 1, § 9 of the Tennessee Constitution and the Sixth Amendment of the Constitution of the United States. The wellspring case analyzing that right on the federal level is *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) which was followed in this State in *State v. Bishop*, 493 S.W.2d 81 (Tenn.1973). In *Barker*, in which the United States Supreme Court found, under the circumstances of that case, that a five-year delay between arrest and trial did not violate the defendant's Sixth Amendment right to a speedy trial, the Court began its approach to the issue by stating that "[a] balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis." They proceeded to identify four of the factors which courts should assess in determining whether a particular defendant has been deprived of his right: (1) length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; (4) prejudice to the defendant.

In this case the presentment was returned against defendant on 19 December 1985. The case was originally set for trial on 6 May 1986 but, due to a succession of continuances, did not come to trial until 28 October 1986, slightly more than ten (10) months having elapsed. Defendant was held without bond from the date of his arrest until the date of his trial. He concedes that this factor standing by itself is not sufficient reason to say that his speedy trial right has been denied. He says the delay in bringing him to trial was presumably prejudicial because more than one month elapsed between his arrest and appointment of counsel and two and one-half months passed between his arrest and his arraignment.

This case initially involved two defendants, both charged with capital murder. The proceedings were complicated by the usual circumstances involved in a case of this magnitude. The Court noted in *Bark-*

er, supra, that until there is some delay which is presumably prejudicial, there is no necessity for inquiry into the factors that go into the additional balancing test to be made by the Court. We cannot say that a presumption of prejudice was created by the circumstances relied on by this defendant. Due to the serious and complex nature of the case we do examine the other factors and circumstances involved.

Looking to the reason for the delay, defendant denies responsibility for holding up any of the proceedings. A large measure of the evidence in this case was contained in more than five hundred pages of testimony transcribed from tapes of conversations recorded between defendant and others, including an undercover police officer. These conversations were initiated in an endeavor to have defendant make incriminating admissions about the Mosher homicide. Ultimately he made statements which did incriminate him and his co-defendant as well. Initially it was the State's intention to try the defendants together. It was necessary for counsel for all parties to work together in an effort to excise superflous material from the tapes. The intent was to present redacted transcripts to the court to resolve pretrial motions essential to the prosecution and to the defense case as well. Ultimately the defendants were tried separately. This did nothing to alter the fact that all counsel had spent many pretrial hours editing the tapes which were substantially the evidence against both defendants. There were numerous motions filed to be dealt with by the court including more than forty on behalf of this defendant. Defendant points out that much of the delay bringing the case to trial was brought about by problems his co-defendant experienced in securing counsel and the necessity to allow co-defendant's counsel time to prepare for trial. There was no lengthy undue delay in bringing this case to a conclusion. There is no evidence of any deliberate attempt to delay the trial and there is absolutely no evidence that defendant was hampered in any way in mounting his defense to the charges against him.

Defendant filed a motion for speedy trial on 28 January 1986, a little more than a month after the charges were preferred against him. He renewed and pressed his motion each time the case was continued. Although he did assert his constitutional right to a speedy trial his greatest effort was aimed at bringing the case to trial within 150 days in accordance with the Class X felony statute. As we have explained heretofore, that was not his entitlement. The delay in this case was not inordinate and we have pointed out the validity of the reasons for delay. There was no serious deprivation which affected the defendant in a negative fashion.

We must look to the degree of prejudice suffered by the defendant. The only specific event related by him is that he was incarcerated during all the time he was awaiting trial in the Hamilton County Jail which, he says, was overcrowded and lacked central dining facilities, or exercise facilities. He charges this confinement brought him to such a depressed state he nearly died as the result of a self-induced drug overdose after the conclusion of the guilt phase of his trial. Defendant did, apparently, attempt suicide by overdosing on prescription drugs on the night before the sentencing hearing was to begin. There is nothing in the record to substantiate his claim that he was in a depressed state of mind due to his incarceration in the Hamilton County Jail. It is equally likely, as the State suggests, that his attempt to commit suicide was the result of the jury verdict finding him guilty. Defendant's past history indicates he had spent many years in prison prior to this offense. The defense testimony of a psychiatric nurse indicated he adapted well to prison life and probably fared much better inside the walls than he did outside. He has failed to establish that his time in jail awaiting trial had any serious detrimental effect upon him.

We have taken each of these factors suggested by the court in *Barker* into consideration as well as all other relevant circumstances to be found in this record. We cannot find that defendant was impeded in any way in his ability to make a proper

defense or suffered in any other manner to any great extent in the relatively short period between the time of his arrest and the conclusion of his trial. We cannot find under the facts in this case that defendant's constitutional rights were infringed upon to the extent which would warrant dismissing the charges against him, or awarding a new trial.

■ An issue is raised protesting admission of a number of photographs of the body of the victim taken at the homicide scene. It is argued that the pictures were of little or no probative value particularly in view of his offer to stipulate the manner of death. Defendant argues that there was nothing in the photographs admitted into evidence which could add anything to the testimonial descriptions of the injury sustained by the victim. He relies on *State v. Banks,* 564 S.W.2d 947 (Tenn.1978), in which this Court approved Federal Rule of Evidence 403 as a proper guide to be followed by our courts in both criminal and civil cases on the admission of relevant evidence. The rule provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

"Unfair prejudice" is defined as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one," *Banks,* at 951. The trial judge examined the pictures in question on counsel's objection to their admission in evidence. There were five pictures of the victim's body at the homicide scene and also a number of autopsy pictures which the State wished to have admitted to show various injuries sustained by the victim in apparent struggle with his murderer. The trial judge denied admission of the autopsy pictures because their probative value was minimal. He admitted those taken at the murder scene. He found they had some potential for prejudice but admitted them because their probative value overwhelmingly exceeded that potential for prejudice.

This was a bizarre and unusual homicide. The trial judge was of the opinion the pictures were demonstrative to establish the homicide as first degree murder. The pictures are exhibits to the record. They do not appear to be particularly gruesome. They do show the position of the body where the homicide occurred and the circumstances surrounding the offense. They illustrate the struggle of the victim and the ferocity of the attack upon him. They depict the crime scene and clarified the testimony of the police officers about what they found there. They were essential to the evidence at the sentencing hearing to establish the aggravating circumstances relied on by the State. Their admission was appropriate under the criteria set by this Court in *Banks,* supra.

■ Defendant protests the admission into evidence of a picture of defendant's brother dressed in a karate suit. It was the State's theory of the case that defendant had solicited the assistance of his brother, a karate expert, to assist in the homicide. Defendant argues that the picture in question had little relevance or probative value and its admission was highly prejudicial. We agree in part. We think the picture was relevant to a degree to establish the State's case. Its probative value and its potential for prejudice were about equal. Neither had any effect on the outcome of the trial. Any error in its admission was harmless.

■ There is no merit to defendant's contention that the court erred in allowing the State to admit into evidence a copy of defendant's prior convictions which was unsigned by the committing judge. He refers to Federal Rule of Criminal Procedure 32(b) which applies to judgments of conviction in a trial court and not to authentication or certification of a public record. These matters are delineated in Federal Rules of Evidence 901 and 902. Of course, the Federal Rules of Evidence, or of Criminal Procedure are not applicable in the courts of this State. In a supplemental brief defendant brings our attention to sev-

eral of the Tennessee Rules of Criminal Procedure as well as citations from a general text on the subject. Tenn.R.Crim.P. 27(2) prescribes the procedure for the introduction into evidence of official records of a sister State. The rule provides that if the record is in the custody of any public official outside the State it may be evidenced by a copy attested by the officer having legal custody of the record, or his deputy, together with a certificate that such officer has the custody. The certificate as to custody may be made by a judge of a court of record of the district or political subdivision in which the record is kept, authenticated by the seal of the court. The rule also provides for the admission of records of a foreign state or country as well. The rule was followed in this case for admission of the record of defendant's prior convictions from the State of New York.

■ Defendant asks us to find error in the admission of evidence which he characterizes as evidence of a new crime. To utilize the language contained in his brief the main evidence in this case linking the defendant to the homicide was a series of undercover tapes presented by the State with alleged admissions in those tapes. In order to obtain an admission from the defendant undercover agents approached him with a proposition to hire him for a sum of money to commit another homicide. After gaining his confidence they then attempted to initiate discussions of the homicide in this case. Defendant concedes that the tapes were extensively redacted but insists the trial court allowed into evidence, over objections by the defense, portions of the undercover tapes which showed that the agents were hiring the defendant to do something which would take a very short period of time in Atlanta for which they were going to pay him $25,000. He says that this ruse is referred to in the trial transcript as the "new crime," but fails to make any appropriate reference to the record where the purported error occurred. T.R.A.P. 27(a)(6).

The inference can be drawn that the undercover officer was soliciting defendant to commit another offense in an effort to gain some admission from him to the homicide at issue here. There is no evidence in the record that defendant committed another crime and we do not find the prejudice to him which he asserts occurred. The original taped conversations, when reduced to writing, consisted of over 500 pages. In order to avoid the potential of prejudice to the extent possible the transcripts were redacted significantly to minimize any indication that defendant was willing to go to Atlanta to engage in another contract murder unrelated to the one for which he was on trial. In *Mays v. State*, 145 Tenn. 118, 140 et seq., 238 S.W. 1096 (1921), this Court went into explicit detail on the law concerning the admission of evidence of other crimes:

"The general rule has been well established that on prosecution for a particular crime evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same character, is irrelevant and inadmissible; but to this rule there are several exceptions. This general rule does not apply where the evidence of another crime tends directly to prove defendant's guilt of the crime charged. Evidence which is relevant to defendant's guilt is not inadmissible because it proves or tends to prove him guilty of another and distinct crime. It frequently happens that two distinct offenses are so inseparably connected that the proof of one necessarily involves proving the other, and in such a case on a prosecution for one evidence proving it cannot be excluded because it also proves the other...."

■ Several other exceptions are noted in *Mays*, which we believe would render the evidence admissible in this case. Where the commission of a crime is proven, evidence to identify the accused as the person who committed it is not to be excluded solely because it proves or tends to prove that he was guilty of another and independent crime. When the nature of the crime is such that guilty knowledge must be proved, evidence is admissible that at another time and place not too remote the

accused committed or attempted to commit a crime similar to that charged. Another exception mentioned is that evidence of other crimes committed by the accused similar to that charged is relevant and admissible when it shows or tends to show a particular criminal intent, which is necessary to constitute the crime charged. Evidence is also admissible to show motive prompting the commission of the crime charged by the accused, and is admissible notwithstanding it also shows the commission by the accused of another crime of a similar character. Thus, in this case, it was admissible to show that defendant was amenable to committing another contract crime for a price. As we have noted there is no actual reference in the record to another offense committed by the defendant. There is no doubt the evidence complained of was admissible in this case as was the reference to the defendant as a contract killer by the Attorney General in his opening statement. The issue is without merit.

An issue has been raised concerning the jury instructions at the guilt-innocence phase of the proceedings. Defendant says it was error for the trial judge to instruct the jury on the elements of the offense of an accessory before the fact which is defined in T.C.A. § 39–1–301.

In a single count the indictment in this case charges defendant with premeditated murder in common law form.

The State's response to a motion for a bill of particulars states in pertinent part:

"It is the theory of the State of Tennessee in the above styled cause of action that:

(1) The defendant Bobby Wilcoxson on the 23rd day of October, 1982, was present, cooperating, assisting and aiding and abetting in the death of Robert Mosher.

.     .     .     .     .

That the defendant Bobby Wilcoxson fled the scene and later made statements to witnesses regarding his complicity in the above described murder."

■ In part, the trial judge instructed the jury, "the State's theory in this case is ... [t]hat the defendant, while absent at the time of the actual homicide, had feloniously moved, incited, hired, commanded, or procured another person to commit the murder of Robert D. Mosher, and thus that the defendant is an accessory before the fact to murder in the first degree." This was error, albeit harmless, because defendant was neither charged nor indicted as an accessory before the fact. It was error because the State responded to the request for a bill of particulars stating the theory of the offense was that defendant was present, cooperating, assisting and aiding and abetting in the homicide. The State may not press their prosecution on a theory upon which the defendant has not been informed or has been misled.

■ It was harmless error because the trial judge in his instructions clearly defined the difference between a principal, that is, the person who actually commits a homicide, and an accessory before the fact. He further directed the jury, if they found the defendant guilty, to state, as part of the verdict, whether they found him guilty, beyond a reasonable doubt, either as a principal, that is one who perpetrated the homicide, or aided and abetted the homicide while being present, actually or constructively; or, as an accessory before the fact. The jury explicitly found the defendant guilty of murder in the first degree as a principal. Any error which might have occurred could not have possibly affected the judgment. T.R.A.P. 36(b). See, e.g., *Cavert v. State*, 158 Tenn. 531, 14 S.W.2d 735, 737 (1929); *Edwards v. State*, 174 Tenn. 532, 128 S.W.2d 629, 630 (1939).

■ Defendant insists it was error for the trial court to quash subpoenas duces tecum issued for the Commissioner of Corrections and the warden of the state penitentiary directing them respectively to bring all articles and accessories used to carry out the death penalty as well as documentary materials "relating to the death penalty ritual and procedures for carrying out the death penalty in Tennessee." It is defendant's contention he was entitled to show the barbarity of the method of capital punishment as a mitigating

circumstance. This Court has dealt specifically with this issue in *State v. Johnson,* 632 S.W.2d 542, 548 (Tenn.1982) as follows:

"In the sentencing proceeding, *evidence may be presented as to any matter that the court deems relevant to the punishment* and may include, but not be limited to the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated ... below; and any evidence tending to establish or rebut any mitigating facts. *Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence.*

The evidence tendered by the appellant and excluded by the trial court was not relevant to, nor did it have any probative value on the issue of punishment, but consisted of matters properly to be considered by the legislature in deciding whether the death penalty is ever a justified punishment for a person convicted of murder in the first degree and, if so, the circumstances under which the death penalty should be imposed."

In *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) cited in *Johnson,* supra, at p. 547, the United States Supreme Court pointed out:

"... that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kinds of capital cases, not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

The Court emphasized, at 98 S.Ct. p. 2965, n. 12 that "nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." The issue must be overruled.

Defendant makes a generalized attack on T.C.A. § 39-2-203, dealing with the sen-

tencing for first degree murder. This Court has consistently upheld the constitutionality of the statute. See *State v. Porterfield,* 746 S.W.2d 441, 451 (Tenn.1988), and cited cases.

■ We have reviewed these proceedings in accordance with the mandate of T.C.A. § 39-2-205 and find that the sentence of death was not imposed in an arbitrary fashion. The jury found three aggravating circumstances:

(1) The defendant was previously convicted of one or more felonies, other than the present charge, which involved the use or threat of violence to the person.

(2) The defendant committed the murder for remuneration or the promise of remuneration.

(3) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.

The evidence supports the jury's findings of these statutory aggravating circumstances and the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances found. We have considered the nature of the crime and the defendant and hold that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases.

The defendant's conviction of first degree murder and the sentence of death are affirmed. The death sentence will be carried out as provided by law on 1 July 1989, unless otherwise stayed or modified by appropriate authority. Costs are assessed against the defendant.

DROWOTA, C.J., and FONES, COOPER and HARBISON, JJ., concur.

ORDER ON PETITION TO REHEAR

PER CURIAM.

Defendant has filed a courteous petition to rehear requesting the Court to reconsider our ruling on his claim of denial of a speedy trial.

We have re-examined the record and are satisfied that there was no oppressive de-

lay nor any due process violation in the pretrial proceedings.

We are also asked to reconsider defendant's Issue No. 8. The Court is firm in the conclusion that the erroneous jury instruction pertaining to "accessory before the fact" was completely harmless under any view of the proceedings.

The petition to rehear is denied.